# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39755**

————————————

**UNITED STATES**
*Appellee*

v.

**Michael F. BONIOR**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 22 December 2020

————————————

*Military Judge:* Joseph S. Imburgia.

*Approved sentence:* Dishonorable discharge, confinement for 120 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 26 April 2019 by GCM convened at Joint Base Pearl Harbor-Hickam, Hawaii.

*For Appellant:* Captain Alexander A. Navarro, USAF; Bethany L. Payton-O'Brien, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges.*

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge MINK and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, in accordance with his pleas and pursuant to a pretrial agree-

ment (PTA), of one specification of failure to obey a lawful order, one specification of destroying non-military property, ten specifications of assault consummated by a battery, one specification of kidnapping, and one specification of communicating a threat on divers occasions, in violation of Articles 92, 109, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 909, 928, 934.[1,2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 11 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. In accordance with the PTA, the convening authority limited confinement to 120 months and approved the remainder of the sentence as adjudged.[3]

Appellant raises five issues[4] for our consideration: (1) whether the military judge abused his discretion by accepting Appellant's plea of guilty to Specification 3 of Charge V and Specification 3 of Charge VI; (2) whether Appellant was denied the effective assistance of counsel under the Sixth Amendment[5] for three alleged deficiencies in the performance of his trial defense counsel; (3) whether Appellant's sentence is inappropriately severe; (4) whether Appellant was punished excessively; and (5) whether Appellant was denied effective assistance of counsel under the Sixth Amendment for his trial defense counsels' failure to utilize exculpatory evidence in his defense.[6]

With respect to issue (4), we have carefully considered Appellant's contention and find it does not require further discussion or warrant relief. *See United*

---

[1] Pursuant to the PTA, Appellant pleaded not guilty to one specification of manslaughter in violation of Article 119a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 919a, but pleaded guilty to and subsequently was found guilty of the lesser included offense of assault consummated by a battery in violation of Article 128, UCMJ. Additionally, pursuant to the PTA, Appellant also pleaded not guilty to one specification of rape and one specification of abusive sexual contact both in violation of Article 120, UCMJ, 10 U.S.C. § 920, one specification of assault consummated by a battery in violation of Article 128, UCMJ, and two specifications of kidnapping in violation of Article 134, UCMJ. These specifications were withdrawn by the Government and dismissed without prejudice.

[2] All references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] The PTA stated the convening authority would approve no confinement in excess of 120 months.

[4] We have reordered and reworded the issues raised by Appellant. Appellant personally raises issues (4) and (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[5] U.S. CONST. amend. VI.

[6] Because issues (2) and (5) concern the same facts and analysis, we address them together.

*States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). On the remaining issues, we find no error that materially prejudiced Appellant's substantial rights. We affirm the findings and sentence.

## I. BACKGROUND

Appellant was an active duty, Tactical Air Controller (TACP) assigned to the 25th Air Support Operations Squadron at Wheeler Army Air Field, Hawaii. The events that led to his court-martial began in the fall of 2017, when Appellant met JTP, a civilian woman who lived near base. The two began dating shortly thereafter. By October 2017, their relationship began to deteriorate and became violent.

In October 2017, while JTP was taking a nap in Appellant's dormitory room, she received a text message of a romantic nature from another man. Appellant noticed the text, became angry, and immediately confronted JTP. During the ensuing argument, Appellant destroyed JTP's phone by throwing it out a fourth-floor window of his dorm room.

A couple of months later, around 18 December 2017, Appellant surprised JTP outside her gym. Upon his arrival, Appellant witnessed another male exiting JTP's car. Appellant immediately confronted JTP about it, and during the ensuing argument Appellant pushed JTP in the face with his hand and took her cell phone. That same month, Appellant also pushed JTP in his dorm room during an argument about Christmas decorations.

A few days later, on New Year's Eve 2017, Appellant and JTP got into an argument at a party because Appellant believed JTP was spending too much time communicating with another man and she was not focused on Appellant. The argument continued when the couple returned to Appellant's dorm room. During the argument, Appellant shoved JTP to the floor. Shortly thereafter, JTP left the room and slept in her car outside Appellant's dorm. The following morning, the couple continued to argue in Appellant's room. At some point during the argument, JTP picked up a "dull" pocket knife and started to rub it against her wrist and threatened to kill herself. JTP then took a piece of broken glass and held it against her throat. Appellant then struck JTP in her ribs with his fist. JTP dropped the broken glass, collected herself, left Appellant's room, and later sought medical care for the injury to her ribs.

A few months later, in April 2018, Appellant met JTP and a few of her friends at a local bar. In the parking lot, Appellant took JTP's keys and phone and became upset by information he found on her phone relating to another man. While arguing in a car JTP attempted to leave and Appellant grabbed her by her hair and pushed her back into the seat. Appellant then produced a pocket knife and continued to interrogate JTP. Both before and during this

incident, JTP discussed with Appellant the possibility that she was pregnant. Understanding this, Appellant then forcibly sat on JTPs stomach, placed his hand on the ceiling of the car, and applied his body weight and pressure to JTP's abdomen.

Later that month, while at Appellant's off-base apartment, Appellant and JTP were arguing about JTP being unfaithful to Appellant. During the argument Appellant pushed JTP into a wall, causing the back of her head to hit the wall. Appellant then dragged JTP across the floor of his apartment, and put her in the bathtub. At first, Appellant ran warm water over JTP's head while telling her that he was going to take care of her. Appellant then sprayed her with cold water and "flipped" and began alternating between warm and cold water. Appellant told her that he learned this at Survival, Evasion, Resistance, and Escape (SERE) training. Eventually, Appellant took JTP to the hospital to receive treatment for injuries she sustained as a result of this incident.

The final incident occurred around the end of June 2018. On this evening, Appellant and JTP had been on a date to a bowling alley arcade. On the way home, Appellant read JTP's text messages that suggested to him that JTP had been unfaithful. Appellant confronted JTP about what he had read, and the couple argued. Appellant became angry and yelled at JTP about what he had read, demanding answers to his questions. JTP repeatedly told Appellant that she wanted to go home. Appellant told JTP to leave his car, but she refused because she was scared as Appellant had her phone and she was unfamiliar with the area. Appellant continued to drive along a highway and stopped at various side roads where he continued to question her. At one point JTP fled Appellant's vehicle on foot. Appellant eventually found her and told that she could get in the car if she wanted to talk, or alternatively that he would leave her on the side of the road. JTP continued to attempt to evade Appellant. Appellant then exited the vehicle, caught up with JTP and pushed her to the ground. In her fall, JTP's head struck a piece of concrete on the ground. JTP appeared to lose consciousness and then was in and out of consciousness. During this incident, Appellant also struck JTP multiple times in the stomach with his hand and slapped her multiple times in the face with his hand. Appellant then got JTP back in the vehicle, where he struck her in the stomach with his hand while driving. JTP continued going in and out of consciousness and asked Appellant to take her to the hospital.

Appellant continued to maintain possession of JTP's cell phone and drove to the end of the road to continue to question her about the text messages. Appellant told JTP that "this is your last stop, this is the end of the road." Appellant then continued to demand answers to his questions and stated he would "bring her down a trail." Appellant informed JTP that her "son will be

better off without [her]."[7] JTP understood these words to be a threat on her life and continued to plead with Appellant to take her to the hospital. Appellant continued to refuse her requests and demanded answers to his questions. Finally, JTP drew Appellant's attention to a passing vehicle and told Appellant that they were calling the police. Appellant ultimately took her to the hospital.

As a result of this incident, JTP's friend, Army Specialist WM, reported the abuse to the Air Force Office of Special Investigations (AFOSI) who opened an investigation on 2 July 2018. JTP was subsequently interviewed by AFOSI agents on 9 July 2018 and again on 13 July 2018. Following JTP's interview on 9 July 2018, Appellant's commander issued Appellant a military protective order (MPO) which prohibited him from having any further contact with JTP. This order was issued verbally and was later delivered to Appellant in writing. Appellant violated this order by interacting with JTP on the phone, via text message, and in person on multiple occasions. After violating his MPO, Appellant was placed in pretrial confinement on 14 July 2018.

## II. DISCUSSION

### A. Military Judge's Acceptance of Appellant's Plea

Appellant contends that the military judge abused his discretion by accepting Appellant's plea of guilty to Specification 3 of Charge V and Specification 3 of Charge VI. Specifically, in regards to Specification 3 of Charge V, Appellant contends that he was acting in defense of JTP when he struck JTP in the ribs with his fist while she was holding a piece of broken glass to her neck. In regards to Specification 3 of Charge VI, Appellant contends the providence inquiry does not support that Appellant held JTP to a specific area, that Appellant held JTP against her will, or that Appellant's conduct was willful.

#### 1. Additional Background

##### a. Assault Consummated by Battery, Specification 3 of Charge V

Appellant pleaded guilty to unlawfully striking JTP in the ribs with his fist, a violation of Article 128, UCMJ. This specification stems from the events of the New Year's Eve celebration on 31 December 2017. At trial Appellant told the military judge:

> Things quickly changed and [JTP] took a piece of glass and held it to her throat. I was concerned about this because I thought the glass could cause substantially more harm. Rather than try to take the glass or distract her or use any of the other non-aggressive methods that had worked in the past, I immediately

---

[7] JTP had a son from a prior relationship.

> punched her in the ribs with my fist. I did not mean to hit the ribs, but only meant to knock the wind out of her. I believe the force I used was excessive and unnecessary to protect her from self-harm. I admit that I did bodily harm to [JTP] when I . . . struck her in the ribs. I admit that these actions constituted an offensive touching. I had no lawful justification for my actions, and was not acting in self-defense. I did not believe I had permission for my actions. I could have refrained from these actions if I had wanted to.

Recognizing Appellant had raised the potential defense of "defense of another" to the specification, the military judge sought to clarify whether Appellant understood the defense. In response to questions from the military judge, Appellant testified that he was feeling "frustrated" that morning and that the force he used "was excessive because the damage done was also an attempt to get her to leave."

Appellant's trial defense counsel then added that Appellant "believes his frustration . . . was predominant to his desire to protect . . . JTP from self-harm." This prompted the following conversation between the military judge and Appellant:

> MJ: Do you agree with what [trial defense counsel] just articulated?
>
> Appellant: Yes, sir.
>
> MJ: So your predominant intent was . . . [t]o inflict bodily harm on her?
>
> Appellant: Yes, sir.

The military judge finished his inquiry by again asking Appellant if he believed that the defense of "defense of another" was applicable in his case. Appellant's trial defense counsel responded "Your honor, [Appellant's] position is that these facts that are described are mitigators for sentencing, but that they do not constitute a full defense." The military judge then asked the Government if there was "a potential issue over . . . defense of another?" Trial counsel replied:

> Yes, sir, we don't believe that there's an issue. And I would like to point, just in case this is reviewed at some point. For the defense of another, there are a couple parts. Understanding that anything up to something likely to produce death of [sic] grievous bodily harm can be allowable. First off, [Appellant] must have actually believed that the force he used was necessary to protect the person, and also that the amount of force he used was

necessary to protect against bodily harm. And I think [Appellant] did also explain that the amount of force he used wasn't necessary.

Appellant and trial defense counsel both agreed with this statement.

### b. Kidnapping, Specification 3 of Charge VI

Appellant also pleaded guilty to kidnapping in violation of Article 134, UCMJ. During the *Care*[8] inquiry for this specification, which focused on the events near the end of June 2018, Appellant told the military judge:

> [W]hile driving with [JTP] in the vehicle, she repeatedly told me that she wanted to go to the hospital or for me to give her back her phone. I know she wanted her phone because she was unfamiliar with where we were at and uncomfortable to leave the car on her own without it. Towards the end of the evening I drove to an industrial road between my place and the hospital and continued to question her. At this point she just kept wanting to go to the hospital and I had the only means to bring her there because I was driving the car and I had the keys and her phone. I believe that my actions when taken over the course of the evening constituted detaining her . . . . I know that she wanted to be left alone because at one point outside the car she tried to leave and I pushed her down. My actions were wrongful because I had no legal justification or excuse. Although I wanted answers and was jealous and upset, that is not a legal reason or excuse. I did not accidentally detain her. I meant to keep her until I received answers that I wanted.

Also during the guilty plea inquiry, Appellant informed the military judge that JTP asked to go to the hospital three to four different times. Appellant stated "[his] possession of her cell phone and [her] inability to coordinate herself with her surroundings" prevented her from leaving and acknowledged that she made an unsuccessful attempt to escape his control. Appellant also confirmed that his use of unlawful force resulted in him being able to confine JTP in his vehicle. Finally, Appellant acknowledged that he detained JTP against her will for up to 60 minutes that night.

### 2. Law

We review a military judge's decision to accept a plea of guilty for abuse of discretion. *United States v. Forbes*, 78 M.J. 279, 281 (C.A.A.F. 2019) (citation omitted). In reviewing the providence of a plea, a military judge abuses his

---

[8] *See United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

discretion only when there is "a substantial basis in law and fact for questioning the guilty plea." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008) (internal quotation marks and citation omitted). "[T]he military judge's determinations of questions of law arising during or after the plea inquiry are reviewed de novo." *Id.* at 321.

"[A]ppellant bears the burden of establishing that the military judge abused that discretion, i.e., that the record shows a substantial basis in law or fact to question the plea." *United States v. Phillips*, 74 M.J. 20, 21–22 (C.A.A.F. 2015) (citation omitted). "However, even if the military judge did not abuse his discretion in accepting the plea, we may still set aside the plea if we find a substantial conflict between the plea and the accused's other statements or other evidence in the record." *United States v. Rothenberg*, 53 M.J. 661, 662 (A.F. Ct. Crim. App. 2000) (citing *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996)).

If an accused, after entering a guilty plea, sets up a matter inconsistent with the plea, the court shall proceed as though he pleaded not guilty. Article 45(a), UCMJ, 10 U.S.C. § 845(a). A providence inquiry into a guilty plea must establish that the accused himself believes he is guilty and "the factual circumstances as revealed by the accused himself objectively support that plea." *United States v. Higgins*, 40 M.J. 67, 68 (C.M.A. 1994) (citation omitted). "Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea." *United States v. Outhier*, 45 M.J. 326, 331 (C.A.A.F. 1996) (citing *United States v. Terry*, 45 C.M.R. 216 (C.M.A. 1972)).

When a defense is raised by the appellant's statements during a providence inquiry, the military judge should explain the elements of the defense to the appellant and resolve the issue, before accepting the guilty plea. R.C.M. 910(e), Discussion; *see also United States v. Lee,* 16 M.J. 278, 281 (C.M.A. 1983). If the accused subsequently does not negate the possible defense, or other evidence belies the negation of the defense, the military judge must withdraw the guilty plea, enter a plea of not guilty, and proceed to trial on the merits. *United States v. Jemmings,* 1 M.J. 414, 417–18 (C.M.A. 1976).

An appellate court "will not overturn a military judge's acceptance of a guilty plea based on a mere possibility of a defense. The record must show a substantial basis in law and fact for rejecting the plea of guilty." *United States v. Faircloth*, 45 M.J. 172, 174 (C.A.A.F. 1996) (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)) (internal quotation marks omitted); *see also United States v. Hayes*, 70 M.J. 454, 458 (C.A.A.F. 2012) (distinguishing a "possible defense" from the "mere possibility of a defense"). In deciding whether a plea is rendered improvident by statements inconsistent with the plea, the sole question is whether the statement was inconsistent, not whether it was credible or plausible. *Lee*, 16 M.J. at 281.

Appellate courts "will not speculate on the existence of facts that might invalidate a plea especially where the matter raised post-trial contradicts an appellant's express admissions on the record." *United States v. Cummings*, No. ACM 39446, 2019 CCA LEXIS 389, at \*20–22 (A.F. Ct. Crim. App. 3 Oct. 2019) (unpub. op.) (citing *United States v. Johnson*, 42 M.J. 443, 445 (C.A.A.F. 1995)).

**3. Analysis**

***a. Assault Consummated by Battery, Specification 3 of Charge V***

We begin with Appellant's conviction for assault and battery for striking JTP in the ribs with his fist. Appellant contends that the military judge abused his discretion by accepting Appellant's guilty plea when Appellant believed he was acting in defense of JTP when he struck her in the ribs with his fist while she was holding a piece of broken glass to her neck. We disagree.

We note the military judge correctly informed Appellant of the elements of the offense—specifically, that during the charged timeframe, "[Appellant] did bodily harm to [JTP;] . . . that [he] did so by unlawfully striking her in the ribs with [his] fist . . .[and] that the bodily harm was done with unlawful force and violence." *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 54.b.(2). For the affirmative defense of defense of others to exist, Appellant must have (1) had a reasonable belief that a person was about to be harmed, (2) believed that the amount of force he used was necessary to protect against bodily harm, and (3) used force that was actually not likely to cause death or grievous bodily harm. *See* Rule for Courts-Martial (R.C.M.) 916(e)(5); *United States v. Dearing*, 60 M.J. 892, 910 (N.M. Ct. Crim. App. 2005), *reversed in part on other grounds*, 63 M.J. 478 (C.A.A.F. 2006).

We find that the military judge did not abuse his discretion in accepting Appellant's guilty plea. Appellant now contends on appeal that his predominant concern was for the safety of JTP. However, Appellant's own admissions during trial contradict the claim he now raises on appeal. In describing to the military judge why he was guilty of this offense, Appellant told the military judge that "[r]ather than try to take the glass or distract her or use any of the other non-aggressive method[s] that had worked in the past, [he] immediately punched her in the ribs with [his] fist." Appellant added that he "only meant to knock the wind out of her," but stated that he believed "the force [he] used was excessive and unnecessary to protect her from self-harm." Appellant also told the military judge that he was "frustrated" and just wanted "her to leave." Finally, Appellant specifically acknowledged that his predominant intent was to inflict bodily harm on JTP, and his desire to protect her was secondary.

Additionally, we note that Appellant and his trial defense counsel were specifically asked by the military judge whether defense of another was an appli-

cable defense. Appellant's counsel stated that it did "not constitute a full defense," and added that it was "mitigating evidence" for sentencing. Trial counsel was also asked the same question, and concurred the defense was not applicable because Appellant did not reasonably believe that the force he used was necessary to prevent JTP from self-harm, which is consistent with Appellant's statements under oath. This extended dialogue, for which Appellant was present, demonstrates that the military judge, counsel for both sides, and Appellant all agreed that the defense was inapplicable. We conclude that there is not a substantial basis in law or fact to question Appellant's plea and that the military judge did not abuse his discretion in accepting the plea.

### b. Kidnapping, Specification 3 of Charge VI

We next turn to Appellant's conviction for kidnapping. On appeal, Appellant contends the providence inquiry failed to support all the elements of the offense and the military judge therefore abused his discretion by accepting Appellant's plea of guilty. Specifically, Appellant argues the providence inquiry does not support that Appellant held JTP to a specific area, that Appellant held JTP against her will, or that Appellant's conduct was willful. We disagree.

The military judge correctly informed Appellant of the following elements of kidnapping: (1) Appellant confined JTP; (2) Appellant held JTP against her will; (3) Appellant did so willfully and wrongfully; and (4) that under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 92.b. The military judge went on to explain:

> "Held" means detain. The holding must be for more than a momentary or incidental detention. For example, a robber who holds a victim at gunpoint while the victim hands over a wallet or a rapist who throws his victim to the ground does not by such acts commit kidnapping because it's incidental to that charged offense. On the other hand, for example, before or after such robbery or rape, if the victim is involuntarily transported some substantial distance, as from a housing area to a remote area of the base or post, this may be kidnapping in addition to robbery or rape.

The military judge also explained that the phrase "against a person's will" means:

> [T]hat the victim was held involuntarily. The involuntary nature of the detention may result from force or some sort of mental or physical coercion or from other means, including false representations. Evidence of the availability or non-availability to the named victim, specifically [JTP], of some means of exit or escape

is relevant to the voluntariness of the detention. As is evidence
of threats, or force, or lack thereof by [Appellant] to detain her.

We find a sufficient basis to support the military judge's acceptance of Appellant's guilty plea to kidnapping. Appellant drove JTP to a secluded location, unknown to her, to isolate her and ensure she could not get away. Appellant did this so that he could question her about text messages he viewed on her phone that suggested she had been unfaithful. In furtherance of his actions, Appellant took JTP's cell phone to ensure she had no way to call for help or find her way home. He refused her repeated requests to return her phone, to be taken home, or to be taken to the hospital. While the plea inquiry indicates that JTP was able to get out of Appellant's car, it also showed that JTP had no real possibility of escape because Appellant parked on the side of an isolated road. This latter point is highlighted by the fact that shortly after JTP exited Appellant's car, he chased her down, physically assaulted her, and got her back into his car. At this point, as a result of hitting her head, JTP was going in and out of consciousness and did not resist getting back in the car. Appellant then refused her multiple requests to return her phone and also refused her requests to take her to the hospital. Appellant then drove JTP further away so that he could continue his "questioning." Appellant stated that he knew that JTP was "unfamiliar with where [they] were at and uncomfortable to leave the car" without her cell phone. He further stated that his detention was "constructive" because JTP was unable to escape his control, and that she was detained against her will.

Furthermore, based on Appellant's admissions, we also find Appellant's purpose for detention was not incidental to the crime of assault; in fact, the assault was incidental to the detention. The criminal act of—and the intent of—prolonged isolation of JTP was intentional, and took place in separate locations, exposing JTP to additional harm and fear. Appellant detained JTP for questioning both in his car and in remote locations which were not required to commit the other offenses. It is also worth noting again that JTP attempted to escape Appellant's detention, and she was unsuccessful due to Appellant's plan and control of the situation. Appellant admitted his objective that evening was to isolate JTP and question her, and he testified that he held JTP against her will for up to 60 minutes. It is immaterial that the location of confinement varied from the side of the road to Appellant's car, as Appellant explained on the record that JTP was held against her will and that he willfully and wrongfully did so. Nothing in the record contradicts what Appellant told the military judge during his providence inquiry. Accordingly, the military judge did not abuse his discretion by accepting Appellant's guilty plea to the kidnapping charge.

## B. Ineffective Assistance of Counsel

### 1. Additional Background

Through appellate defense counsel, Appellant raises three grounds for ineffective assistance of his trial defense counsel, alleging that they: (1) failed to prepare for trial; (2) failed to move for a speedy trial violation under Article 10, UCMJ, 10 U.S.C. § 810; and (3) failed to object to an unreasonable multiplication of charges. Additionally, Appellant personally claims that his trial defense counsel were ineffective in that they failed to utilize exculpatory evidence for his defense.

On 23 July 2020, our court ordered Appellant's three trial defense counsel, Major (Maj) SA, Captain (Capt) AB, and Capt AS, to provide responsive declarations. We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense team's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967). We find a hearing unnecessary to resolve Appellant's claims.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id*. (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both deficient

performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Id.* (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

When an appellant alleges ineffective assistance of counsel after pleading guilty at trial, he must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012) (quoting *Hill v. Lockhart*, 474 U.S 52, 59 (1985)).

**3. Analysis**

We find each of the claims of ineffective assistance of counsel to be without merit.

### a. Trial Preparation

Appellant's first contention is that his three detailed military defense counsel failed to properly prepare for a contested trial and that as a result of their lack of preparation, they pressured him to plead guilty and told him he had "no choice but to sign" the PTA. Appellant states that his counsel did not physically arrive until six days before trial and that they did not listen to all of the recorded phone calls between Appellant and JTP while Appellant was in pretrial confinement. In support of this contention, Appellant states that the number of times he consulted with his counsel during the providence inquiry is evidence that his attorneys had an insufficient understanding of his case. Appellant also contends that it shows that his trial defense counsel were ill-prepared for his presentencing hearing. Finally, Appellant contends that his trial defense counsel failed to investigate and present his mental health history in sentencing, and that this failure left the military judge without "critical evidence" to consider in arriving at a sentence.

We begin our analysis by noting that before engaging in the guilty plea inquiry with Appellant, the military judge informed Appellant he must actually be guilty of the offenses to which he was pleading guilty and that he would be required to admit every element of those offenses. We also note that a similar discussion took place between the military judge and Appellant regarding

the stipulation of fact. We further note that after the guilty plea inquiry, the military judge again asked Appellant if he wanted to plead guilty, and gave him additional time to consult with his counsel prior to accepting his pleas. In response Appellant stated, "Your Honor, thank you for giving me time to consult with my defense counsel as to the decision whether or not to plead guilty . . . Your Honor, at this time I am ready to plead guilty." We also note that Appellant confirmed to the military judge that he had enough time to fully consult with his defense team and that he received the full benefit of their advice. He also confirmed that he was satisfied that his defense team's advice was in his best interest and that he was satisfied with his three defense counsel. Finally, we note that Appellant's declaration does not allege his sworn statements to the military judge were inaccurate.

All three defense counsel assert they were fully prepared for a litigated trial. Maj SA, who at the time was the chief circuit defense counsel for the Pacific Circuit and stationed at Kadena Air Base in Japan, stated in her declaration that she arrived unusually early, ten days before trial, to prepare for a litigated trial. She also stated that their actual preparation started long before their arrival in Hawaii. Capt AB, who at the time was an area defense counsel at Kadena Air Base, Japan, stated that she understood the case to be complex, and traveled to Hawaii three different times, for a total of 14 days, to prepare for trial. Additionally, Capt AS, who at the time was an area defense counsel at Joint Base Langley-Eustis in Virginia, stated that she also arrived in Hawaii ten days before trial. Capt AS stated that prior to traveling to Hawaii, the defense team had met via phone and discussed at length the state of the evidence against Appellant. Capt AS stated that Maj AS and Capt AB had already "created in-depth color-coded charts of the evidence" detailing the strengths and weaknesses for all charges and specifications, how to exploit weaknesses, and other ideas for evidence including follow-up questions for witnesses. The attachments to the declarations, to include travel orders and billeting receipts, support their position that they were in Hawaii for a longer period than Appellant claims.

The declarations from defense counsel also state that their preparation included speaking to multiple experts in forensic psychology, digital forensics, and forensic pathology. Maj SA described speaking to Appellant "numerous times . . . [reading] all documentary evidence, listen[ing] to all audio files, consult[ing] with experts, follow[ing] every viable lead [from] [Appellant], conducting physical site visits . . . [and gathering] reports and records that even the government investigators were not able to retrieve." Capt AB affirmed that she listened to all of the recorded phone calls of Appellant. Maj SA stated confinement audio recordings totaled approximately 60 hours, and that Capt AB copied or transcribed some of them for everyone's use. Maj SA stated that following their review of the phone calls, it was not "in [Appellant's] best interest for

the government to listen to these calls. . . . [w]e felt [that] . . . the calls contained hours of damaging conversations between [Appellant] and [JTP] as well as [Appellant] and his mother."

In her declaration, Maj SA specifically denied that Appellant was forced to plead guilty. She stated that the Government suggested a PTA, and that she believed the terms would be in Appellant's best interest because they removed his exposure to a number of serious offenses including the Article 120, UCMJ, offenses, which would have potentially required Appellant to register as a sex offender. She also affirmed that she instructed Appellant that it was his choice whether to plead guilty in accordance with a PTA with the convening authority. Additionally, all trial defense counsel deny instructing Appellant that he had "no choice" but to sign the PTA offer and plead guilty. In support of her declaration, Maj SA attached Appellant's detailed elections regarding his pleas, which demonstrate the opposite of what he says now and show in writing that it was Appellant's knowing and voluntary decision to plead guilty. This document also demonstrates that Appellant's counsel discussed in detail Appellant's rights, options, and choices with him prior to his decision. Appellant personally signed his elections on pleas on 17 April 2019, five days before his trial. Finally, we note that Appellant affirmatively indicated his desire to submit an offer for a PTA in this document.

Regarding Appellant's mental health records, the trial defense team articulated strategic reasons for not introducing this evidence. The record shows that in preparing for trial, trial defense counsel did their due diligence and sought and obtained a sanity board evaluation of Appellant under R.C.M. 706. They also sought and obtained the resources of experts to review the sanity board reports. Maj SA provided that it was their collective opinion, after reviewing the reports, that opening the door to Appellant's mental health records would expose him to much more damaging rebuttal evidence, and that it was not in Appellant's best interest to present this information. Additionally, trial defense counsel strategically decided not to put Appellant's alcohol use at issue in sentencing because it had the potential to open the door to other instances of assault that were evidenced in text messages as well as other instances from his life before the Air Force that were "incredibly" harmful to Appellant's character and rehabilitation potential. Maj SA provided that they discussed this strategy with their expert consultant, who provided input and agreed with the strategy. Maj SA also added that Appellant was consulted about this strategy before trial, and he approved it.

In looking at the motives of each party in writing their declarations, we give added weight to the attachments submitted by Appellant's defense counsel, including the travel orders, billeting receipts, and Appellant's written elections on pleas. These documents demonstrate that all defense counsel were in

Hawaii before Appellant claims, and that Appellant made a knowing, voluntary and conscious decision to plead guilty well before trial and after he was fully advised of his available options. We also note that Appellant's post-trial assertions are at odds with the evidence, defense counsels' declarations, and Appellant's own statements at trial. We find it more probable that Appellant did not know the amount of preparation and the travel schedules of his counsel, which is understandable because he was in pretrial confinement for much of the preparation time and unable to appreciate the work of his three defense counsel.

The record as a whole compellingly demonstrates that Appellant's trial defense counsel fully investigated and prepared for a litigated trial. They spoke with dozens of potential witnesses, to include expert witnesses, listened to hours of recordings of phone calls, reviewed all documentary evidence, and followed all viable leads. The declarations submitted by the defense team also indicate that they tailored a reasonable trial strategy, including the negotiation of a PTA that removed a number of other serious offenses from consideration by the court-martial. Further, the declarations demonstrate they diligently worked to minimize Appellant's statements at trial and otherwise shape the trial and guilty pleas in Appellant's best interests. Appellant's trial defense team filed a number of pretrial motions, and nothing in the record shows that Appellant expressed any concern in the days before trial regarding the lack of witnesses or trial preparation. When asked on the record, Appellant stated that he was satisfied with his defense counsel.

In conclusion, we find that Appellant has failed to meet his burden of showing deficient performance by his trial defense counsel. The declarations submitted by trial defense counsel indicate that they conducted a thorough investigation of the case and were preparing to have defense witnesses available to testify at trial. Following their investigation and after determining Appellant faced the likelihood of a significant sentence and might avoid sex offender registration, the trial defense team recommended Appellant consider the Government's PTA offer. There are reasonable explanations for trial defense counsels' actions and advice, and their individual and combined level of advocacy on Appellant's behalf was not "measurably below the performance ordinarily expected of fallible lawyers." *Polk*, 32 M.J. at 153. The record indicates that the defense team's recommendation to accept the PTA and decision to not introduce evidence on Appellant's mental health were strategic and tactical decisions which we will not second guess. Finally, we see no evidence in the record that suggests Appellant was forced to enter into a PTA, agree to a 13-page stipulation of fact, or to plead guilty. There is also no evidence in the record to suggest a reasonable probability that, but for counsels' alleged errors, he would not have pleaded guilty and would have insisted on going to trial. In fact, the

record demonstrates the opposite—that Appellant knowingly and willingly pleaded guilty at trial in order to obtain the benefit of the PTA.

### b. Speedy Trial

Appellant next contends that his trial defense counsel never informed him regarding the possibility of moving for relief under Article 10, UCMJ, for a speedy trial violation. Appellant opines that because of this failure, he was not aware that he could ask the court to dismiss the charges, and that this contributed to him being convicted of the charges and specifications.

We note at the outset that indeed there is no evidence in the record that Appellant demanded a speedy trial. Maj SA stated in her declaration that the defense team did discuss with Appellant the possibility of filing a speedy trial motion under Article 10, UCMJ. Capt AB provided that they advised Appellant that it was not in his best interest to file a motion to dismiss for speedy trial violations for a number of reasons.

First and foremost, the defense team felt that the motion lacked merit. Capt AB provided that they did not believe that the length of delay and the reasons for the delay were unreasonable. The evidence in Appellant's case was voluminous, including closed-circuit television footage of JTP at the hospital, audio recordings of calls between Appellant and JTP, AFOSI interviews of Appellant and JTP, extensive medical records, police reports and lengthy calls Appellant made from confinement, as well as a large number of text messages between Appellant and JTP. Capt AB provided that the Defense requested much of this evidence during discovery and that trial counsel were transparent and diligent regarding their attempts to acquire this discovery. In the end, all defense counsel believed the Government was being reasonably diligent in moving this case to trial. Additionally, Capt AB stated that much of the delay in getting to trial was actually driven by the availability of Appellant's three counsel; they needed to find three weeks of availability for the trial on their combined calendars. Maj SA provided that this was discussed with Appellant as well as the option of finding new counsel who might be available for trial sooner. Appellant, however, expressed his desire keep his defense team, even if it meant a later trial date.

Additionally, Capt AB provided that she did not think it was in Appellant's best interest to file a speedy trial motion, because she wanted to proceed to trial as soon as they could to minimize the chance that the Government would discover evidence of uncharged and ongoing misconduct that the Defense had found. Captain AB also discussed the defense team's concern that if they filed a speedy trial motion and did not get a dismissal with prejudice that the Government would have more time to discover this evidence and prefer additional charges against Appellant. Furthermore, Capt AB discussed that it was their

understanding that JTP was wavering regarding her participation in the trial and that she became more committed as time passed. Capt AB stated that strategically they thought they were better off getting to trial sooner rather than later. Finally, trial defense counsel stated that they also "wanted to limit the amount of delays . . . for fear that [Appellant] could lose" a very favorable PTA.

Because trial defense counsel articulated strategic reasons for not filing an Article 10, UCMJ, motion that are objectively reasonable, it is unnecessary to discuss its merits. We will not second guess their trial defense strategy. We evaluate defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *See United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998), *aff'd*, 52 M.J. 278 (C.A.A.F. 2000)). There are reasonable explanations for trial defense counsels' actions and advice, and their individual and combined level of advocacy on Appellant's behalf was not "measurably below the performance ordinarily expected of fallible lawyers." *Polk*, 32 M.J. at 153. We conclude Appellant has failed to meet his burden to demonstrate deficient performance.

### c. Unreasonable Multiplication of Charges

Appellant next contends that his trial defense counsel were ineffective by failing to make an unreasonable multiplication of charges motion in an effort to merge Specifications 1 and 9 of Charge V, which relate to assaults that took place in April 2018; Specifications 4 and 7 of Charge V, and the Additional Charge and its Specification, which relate to assaults that took place around the end of June 2018; and Specifications 5 and 8 of Charge V, which relate to assaults that took place in December 2017. Appellant argues that, although in the context of pretrial agreements strategic reasons may exist to withdraw or waive such a motion, none are evident in the record. Appellant further contends that trial defense counsels' failure to make such a motion falls below the objective standard of reasonableness required under the Sixth Amendment. In the alternative, Appellant asks this court to use our plenary power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief.

As to the errors raised by Appellant on appeal, Maj SA stated in her declaration that the defense team believed that a motion to merge Specifications 1 and 9 of Charge V was baseless. The defense team believed these specifications adequately represented two distinct incidents of assault that were separated by sufficient time and an alleged forcible rape of JTP that was dismissed pursuant to the PTA. The defense team explained that they strategically chose not to litigate this motion because they did not want to draw the military judge's attention to the dismissed charge or expose Appellant to any aggravating facts

or potential uncharged misconduct that was not already referenced in the stipulation of fact.

A similar strategy was also applied by the defense team with respect to Specifications 5 and 8 of Charge V. The defense team again believed that these specifications represented two distinct incidents of assault that occurred on two different days in December 2017. Trial defense counsel strategically chose not to file an unreasonable multiplication motion for three reasons: (1) they did not believe they had a basis to make the motion; (2) they did not want to expose the military judge to aggravating evidence from outside the stipulation of fact regarding these specifications that would paint Appellant in a bad light; and (3) they wanted to avoid the possibility of JTP testifying on the motion, which would have set up a scenario in which she attacked Appellant's credibility and version of events. Regarding Specifications 4 and 7 of Charge V, as well as the Additional Charge and its Specification, the defense team believed that these were all very distinct events separated by time, location, and actions, and again strategically chose not to litigate the issue further to avoid unfavorable facts.

Appellant has again failed to meet his burden of showing deficient performance and also failed to overcome the strong presumption that counsels' performance was within the wide range of reasonable professional assistance. There are reasonable explanations for trial defense counsels' actions and advice, and their individual and combined level of advocacy on Appellant's behalf was not "measurably below the performance ordinarily expected of fallible lawyers." *Polk*, 32 M.J. at 153. Furthermore, trial defense counsel have articulated multiple strategic reasons for not filing this motion that are objectively reasonable. We will not second guess their defense strategy. The defense declarations make clear that the defense team sought to shape the facts and narrative of the crimes committed by Appellant in the light most favorable to Appellant. Based on our review of the evidence to include the declarations of defense counsel, the defense team was somewhat successful in this regard. By not raising the motion for the unreasonable multiplication of charges, they avoided prolonged dialogue with the sentencing authority about unfavorable facts showing the intervening time periods or events that made these specifications unique, separate criminal acts.

Finding that counsel were not ineffective for failing to file an unreasonable multiplication of charges motion, we now turn our attention to Appellant's request for this court to use its power under Article 66(c), UCMJ, to provide relief. It is clear from the record that Appellant waived this issue by failing to raise it at trial and because he agreed to waive all waivable motions as a condition of his PTA. Additionally, Appellant pleaded guilty to the charged offenses and voluntarily described each event to the military judge as a separate act. Appellant may not now contradict his guilty plea, the stipulation of fact he

entered into at trial, and the sworn confessional statements he made at trial. *See Ginn*, 47 M.J. at 248 (citing *United States v. Wilson*, 44 M.J. 223 (C.A.A.F. 1996)). Additionally, because an unreasonable multiplication of charges motion was never litigated in Appellant's case, the record contains little information about what occurred between these specifications. Therefore we assess Appellant's likelihood of mounting a successful motion to be extremely remote.

Even in the face of waiver, the Courts of Criminal Appeals are empowered under Article 66(c), UCMJ, to consider claims otherwise waived as part of our obligation to affirm only such findings and sentences which are correct in law and should be approved. *See United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016). We decline Appellant's invitation to reject his pleas or to otherwise pierce his waivers under our Article 66(c), UCMJ, authority. *See United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996).

### d. Witnesses and Exculpatory Evidence

Finally, Appellant personally contends he gave his trial defense counsel a list of names of potential witnesses for the Article 32, UCMJ, 10 U.S.C. § 832, hearing, and that none of the witnesses were called on his behalf at the hearing. Appellant also alleges that before trial, he added names to that potential witness list totaling between 50–60 witnesses. Appellant also alleges that his counsel failed to review and present jailhouse phone calls that revealed exculpatory information, such as pressure from prosecutors and falsities in JTP's statements.

We are not persuaded by Appellant's contentions. The fact that names were provided, but those witnesses were never called at a hearing or trial, is not in and of itself error. It could be error if counsel did not exercise diligence in tracking down leads or finding matters for sentencing, but there is nothing in the record to suggest that is the case. To the contrary, the record shows that Appellant's counsel adequately researched potential exculpatory evidence and witnesses and sought evidence for mitigation and extenuation. Appellant cites no specifics about what information his counsel should have found, much less how the information would have resulted in a different outcome if it was admitted at trial. Appellant also fails to discount the rational, strategic reasons given by his counsel for why these witnesses were not called on his behalf—mainly that they were unhelpful to his case. The declarations from trial defense counsel demonstrate that they strategically chose not to bring them to court.

As to the jailhouse phone calls, Appellant's defense counsel again declared they reviewed all of the phone calls, and that there was no exculpatory information contained therein. Furthermore, their declarations provided that the calls were not in possession of the Government and that it was in Appellant's

best interest for it to remain that way. Appellant's defense counsel declared that these calls were incredibly damaging to Appellant's case, and even if some were helpful, presenting them at trial would have required the Government to possess all of the calls and caused harm. Appellant again cites no specifics to show what exactly was excluded and why it would have been beneficial. Appellant also makes reference to unlawful command influence, and to letters located in his apartment that were never admitted. However, Appellant fails to provide any specifics as to what those letters contained or what his command did or failed to do. Mere speculation is not enough to show that his trial defense counsel were ineffective. Therefore we conclude that Appellant has failed to meet his burden to show deficient performance and overcome the strong presumption that trial defense counsels' performance was within the wide range of reasonable professional assistance.

## C. Sentence Appropriateness

Appellant contends his sentence to confinement was not appropriate given the entire record of trial, his character and military service, and the nature of the offenses to which he pleaded guilty. We disagree.

This court "may affirm only . . . the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ. We review sentence appropriateness de novo, employing "a sweeping Congressional mandate to ensure 'a fair and just punishment for every accused.'" *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (citations omitted). We are tasked with ensuring Appellant receives the right amount of punishment for his offenses. *See United States v. Barker*, 28 M.J. 121, 122 (C.M.A. 1989). In determining whether a sentence is appropriate, we consider the "particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009). We have a great deal of discretion in determining whether a particular sentence is appropriate, but we are not authorized to engage in exercises of clemency. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988).

After conducting a review of the entire record, we find that the sentence is appropriate. In reaching this conclusion, we considered Appellant's unsworn statement, his enlisted performance reports, the defense exhibits submitted at trial, and all the matters submitted by Appellant during clemency. We also considered the facts of the offenses to which Appellant pleaded guilty and all other properly admitted matters. Appellant was 28 years old when he began dating JTP and, over the course of their troubled relationship, spent months repeatedly threatening, assaulting, and injuring JTP, as well as kidnapping her. Appellant faced a maximum sentence that included confinement for life

without parole and a dishonorable discharge. Trial counsel recommended a dishonorable discharge and confinement for 13 years. The military judge adjudged a sentence that included 11 years of confinement and a dishonorable discharge—far below the maximum term of confinement. In accordance with the PTA, the convening authority further limited confinement to 120 months. We find Appellant's approved sentence of a dishonorable discharge, confinement for 120 months, forfeiture of all pay and allowances, and reduction to the grade of E-1 is not inappropriately severe.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court